**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **WILLIAM R. GENSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 11-CV-227-PJC** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Claimant, William R. Genson ("Genson"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying his application for disability benefits under the Social Security Act,

42 U.S.C. §§ 401 *et seq.*  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have

consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be

directly to the Tenth Circuit Court of Appeals.  Genson appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that Genson was not disabled.  For the reasons discussed below, the Court

AFFIRMS the Commissioner's decision.

### Claimant's Background

Genson was 30 years old when he testified at the hearing in front of the ALJ on

December 3, 2009.  (R. 22, 29).  Genson testified that he started working for temporary job

placement companies when he was 18 years old.  (R. 32).  His job assignments ended with him

being fired after a short period of time.  (R. 31-40).  Genson testified that he had been told at

each new job assignment that he was doing something wrong.  (R. 32).  He further testified that

he was fired at the various jobs because he made mistakes, was slow, or did not complete his

work.  (R. 33-41).  He also said that he had been fired for having angry outbursts.  (R. 37-38).

Genson testified he was disabled and unable to work because he suffered from attention-deficit/hyperactive disorder "(ADHD")[1], bipolar disorder, and depression.  (R. 35).   He said that he had been prescribed Wellbutrin and Zoloft, but he felt that neither medication helped him.  (R. 53-54).

Genson testified that as a child, he was in special education classes until the sixth grade. (R. 29-30).  Genson said that he was placed in regular classes when he started seventh grade because the school did not have the correct paperwork.  (R. 30).  After being placed in regular classes, Genson had difficulty keeping up and completing assignments.  *Id*.  He testified that he quit school in the seventh grade because he could no longer understand the classes and was not learning anything. (R. 30-31).  He stated that he once took the introductory GED placement test, but that his score was too low for placement.  (R. 41).  Genson testified that he could read the newspaper by reading small words and by utilizing the dictionary.  *Id*.  He said that on one occasion it took him five hours to fill out an application for employment.  (R. 42).  Genson testified that he had problems with numbers and math.  *Id.*  He said he felt uncomfortable in check-out lanes because he had difficulty making change.  *Id.*

Genson testified that he had difficulty with concentration and memory, such as forgetting what he was doing between the time he gets up to when he's getting ready to leave.  (R. 47-48). He said that he could not get from "point A to point B" and becomes physically and mentally lost  (R. 36-37, 48).  One temporary service told him that they would not use him again because he got lost three times at a job site.  (R. 36-37).  Genson said that he was fired from another job

---

[1] ADHD is a behavioral disorder with a persistent pattern of inattention and/or hyperactivity-impulsivity.  Diagnostic and Statistical Manual of Mental Disorders 85 (Text Revision 4th Ed. 2000) (hereinafter "DSM IV").

because he physically hit a fence after becoming angry when he could not remember what he was supposed to do. (R. 38). He was fired from a fast food restaurant after another emotional outburst because he could not remember which size plate to use. (R. 38-39, 43-44).

On January 23, 2008, Genson was seen by Mike Merrill, LMFT, for a screening assessment at Family & Children Services ("F&CS"). (R. 168-74). Genson noted that he needed help with ADHD. (R. 168-69). Genson reported that he had received counseling in the past at Children's Medical Center. *Id.* Genson noted that he had problems with racing thoughts and trouble focusing. (R. 171-72). He also reported that he had difficulty controlling his temper, which had caused him to lose jobs. (R. 173). Genson denied a history of attempted suicide. (R. 171). Mr. Merrill indicated Genson was "had occasional bouts of temper and [was] struggling with an undiagnosed attention problem." (R. 173). Mr. Merrill gave Genson a Global Assessment of Functioning ("GAF") score of 50.[2] *Id.* There are no subsequent treatment notes from F&CS.

Genson started outpatient psychiatric treatment at Grand Lake Mental Health Center ("GLMH"), for symptoms of depression and ADHD in September 2008 to October 2009. (R. 195-217, 225-73). During that time, he was seen on approximately a monthly basis by John Mallgren, D.O., for pharmacological management, and Chelsea Compton, BA, for individual rehabilitation or skills development. *Id.*

Raymond Teel, MA, LPC, conducted Genson's initial screening at GLMH on September 5, 2008 and Genson's initial assessment on September 11, 2008. (R. 200-17, 238). Genson

---

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV 32-36 . A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.* at 34.

reported that he suffered from depression and anxiety. (R. 210, 217). He also reported feeling helpless, hopeless, worthless, and reported that he had lost interest in his normal activities and had lost his appetite. (R. 203, 210, 216-17). Genson also reported that he had problems with fatigue, isolation, withdrawal, and with his memory and attention span. (R. 203, 210, 213-14, 217). He said that he had difficulty performing his activities of daily living. (R. 210). He reported that he was unable to retain employment due to the severity of his symptoms. *Id.* Genson told Mr. Teel that he had visual hallucinations of shadows moving and audible hallucinations of voices talking to him. (R. 203, 214). Genson also stated that he had tried to commit suicide in 2004 by crashing his car. (R. 214).

During the interview, Mr. Teel noted that Genson's speech was rapid, pressured, and tangential. (R. 203, 214). Mr. Teel reported that Genson had problems with his attention and frequently had to be redirected. (R. 203, 214, 217). Mr. Teel assessed Genson with major depression, recurrent, with psychotic features, and ADHD. (R. 201, 215). Mr. Teel assessed Genson's GAF at 43. *Id.* Mr. Teel wrote Genson's prognosis was "fair to guarded." (R. 203, 216). On October 1, 2008, Genson reported that his medications were helping to reduce his depression and that his concentration had greatly improved. (R. 196). He also reported improvement in his ability to manage his anger and irritability. *Id.* Ms. Compton described Genson as having an elevated mood, flat affect, fair attention span, and fair thought process. *Id.*

Genson saw Dr. Mallgren on October 14, 2008 for pharmacological management and Genson reported that his medications were controlling his symptoms. (R. 197). Genson denied suicidal/homicidal ideation and denied psychotic features. *Id.* Dr. Mallgren prescribed refills of Wellbutrin and Trazadone. (R. 198-99). On November 11, 2008, Genson did not show for a follow-up appointment with Dr. Mallgren. (R. 236).

On November 14, 2008, Genson told Ms. Compton that he was having difficulty with his medications and felt that the dosage needed to be increased. (R. 235). He said that his depression had decreased to a tolerable level but reported that he continued to have daily problems with his ability to focus and concentrate. *Id.* On November 19, 2008, Genson acknowledged that he had missed a few times to pick up his medications, but that he had finally gotten them and that they were starting to help. (R. 234). Genson reported that he was doing pretty well but still had difficulty with concentration and with his attention span. *Id.*

Genson had a follow-up appointment with Dr. Mallgren on December 9, 2008. (R. 232). Dr. Mallgren also noted that Genson had not picked up his medication so he did not know if it was helping. *Id.* When Genson specifically inquired about Dr. Mallgren's opinion of his disability, Dr. Mallgren noted that Genson met the criteria for a Mood Disorder but that gainful employment might be possible if his emotional condition was controlled. *Id.* Genson denied suicidal ideation and psychotic features. *Id.*

Genson visited with Ms. Compton again on December 17, 2008, and she noted that Genson had difficulty remaining focused and staying on topic. (R. 231). At that time, Genson reported being upset about being unable to work and did not want to be fired from another job. *Id.*

On January 6, 2009, Genson failed to show for another appointment with Dr. Mallgren. (R. 229). Subsequently, on January 15, 2009, Ms. Compton noted that Genson was in "a very unusual mood" and that he was "very upset and agitated." (R. 228). Because he had cancelled his last appointment, Genson had run out of his medications and said that he was unable to "last much longer" without them. *Id.* Genson indicated he would not miss another appointment because he did not want to be without his medication. *Id.*

Genson met with both Dr. Mallgren and Ms. Compton on February 3, 2009. (R. 225-27). Genson reported to Ms. Compton that he had recently been fired from a job after working only one day because he was slow completing his work. (R. 225). He expressed concern that the medication might be the cause of his slowness. *Id.* However, there is also a notation that he was unable to afford his medication. *Id.* Dr. Mallgren's notes from that same day indicate that Genson's medication was working and Genson denied suicidal ideation and psychotic features. (R. 226-27). Dr. Mallgren also discussed vocational rehabilitation with Genson, but Genson told him they would not work with him. (R. 226).

On March 3, 2009, Genson told Ms. Compton and Dr. Mallgren that his medications continued to help him. (R. 257, 273). Genson advised that his irritability and anger had decreased but that he still had problems with his memory and with his ability to focus and concentrate. *Id.* Genson denied psychotic features and suicidal ideations. (R. 257).

Genson missed his March 31, 2009 appointment with Dr. Mallgren. (R. 255). On April 3, 2009, it was determined that Genson had not received a reminder call because his phone number had changed. (R. 272). Ms. Compton noted that Genson's mood was sad and that his affect was flat. *Id.* She wrote that Genson maintained good attention and tangential thought process during his appointment. *Id.*

Genson reported to Ms. Compton and Dr. Mallgren on April 28, 2009, that he was doing better on his medications. (R. 252, 271). Genson also indicated that a healthy change in his diet had also significantly contributed to helping him feel better. *Id.*

Genson continued to see Ms. Compton and Dr. Mallgren on a monthly basis from May through August 2009. (R. 242-49, 267-70). Ms. Compton continued to make notations that Genson was doing well but that he still struggled with focus, memory, concentration and

irritability. (R. 268-70).

On September 9, 2009, Ms. Compton noted that Genson had an elevated mood, flat affect, intermittent attention span, and racing thoughts. (R. 267). Genson told Compton that he was having trouble being patient with his children and was becoming easily agitated and irritated with them. *Id*. He said that his medications helped him, but not completely. *Id*.

The record has an unsigned[3] copy of a treatment plan from GLMH dated September 10, 2009. (R. 260-65). Genson reported continued difficulty with his ability to focus and concentrate, difficulty with his short-term memory, and with racing thoughts. (R. 262). He also continued to experience difficulty with irritability and controlling his anger. *Id*. He also reported difficulty sleeping. *Id*. Genson's diagnoses were major depression, recurrent, with psychotic features, and ADHD. (R. 260). Genson's GAF score was recorded at 46. *Id*. On September 15, 2009, Dr. Mallgren noted that Genson continued to benefit from his medication and refilled his prescriptions. (R. 239-40).

On October 13, 2009, Genson met with Robert Henson, LPC, at GLMH. (R. 266). Mr. Henson noted that Genson was irritable and had a blunt affect during his appointment. *Id*. Genson's attention span was noted as fair and his thought processes were racing. *Id*. Genson reported that he was upset from being laid off or fired from recent jobs and that he was dealing with financial stressors. *Id*. Genson indicated that he was going to either start a lawn service or get approval for disability benefits. *Id*.

Agency consultant Michael D. Morgan, Psy.D., conducted a consultative examination on

---

[3] The author of the treatment plan is unidentified anywhere by name or initials. However, from comparing the Provider Number associated with Genson's September 11, 2008 evaluation to the Provider Number associated with the September 10, 2009 plan, it appears Mr. Teel *may* have authored both. However, there may be other possible explanations. (*See* R. 201, 260).

August 8, 2008.  (R. 176-80).  Genson told Dr. Morgan that he that he had an eighth grade

education with low-average grades.  (R. 177).  Dr. Morgan determined that Genson's educational

history indicated that he operated at the low-average level of intelligence.  (R. 178).  Genson

reported that he was unable to work because he had ADHD and experienced symptoms of

restlessness, irritability, and transient problems with his concentration.  (R. 176).  Genson also

reported problems with fatigue, low motivation, anxiety, and irritability.  (R. 176-77).  Genson

did not report any episodes of decompensation or a history of suicide attempts to Dr. Morgan;

Genson also denied suicidal and homicidal ideations.  (R. 177-78).  Genson said that he was able

to care for himself, drive, complete household chores, engage in strenuous activity, and manage

his finances. (R. 177).  Genson reported that most of his day was spent caring for his young son,

performing household chores, and watching television.  *Id*.

In evaluating Genson's mental status, Dr. Morgan found that Genson did not meet the

criteria for major depression, mania, or hypomania.  (R. 178).  Dr. Morgan found that Genson

had no significant impairment in transferring newly learned information to long-term memory.

*Id*.  Dr. Morgan diagnosed Genson with generalized anxiety disorder, and a GAF score of 71-75.

(R. 179).  Genson's symptoms included uncontrollable worry, restlessness, feeling on edge,

being easily fatigued, irritable, having transient problems with concentration and irritability, and

difficulty sleeping.  (R. 178).  Dr. Morgan opined that "with appropriate treatment, [Genson] can

achieve a higher level of psychological functioning in one to two years."  (R. 179).

Non-examining agency consultant Cynthia Kampschaefer, Ph.D., completed a

Psychiatric Review Technique on August 11, 2008 and determined that Genson had a non-severe

medically determinable mental impairment.  (R. 181-94).  For Listing 12.06, Dr. Kampschaefer

noted that Genson had generalized persistent anxiety, as evidenced by apprehensive expectation.

(R. 181, 186). For the "Paragraph B Criteria,"[4] Dr. Kampschaefer assessed Genson with mild limitations of his activities of daily living and in maintaining social functioning. (R. 191). She found no difficulties of concentration, persistence, or pace. *Id.* She also found no evidence regarding episodes of decompensation.[5] *Id.* In the Consultant's Notes portion of the form, Dr. Kampschaefer referred to the intake form from F&CS and then summarized the findings in Dr. Morgan's report. (R. 193).

Keith Patterson, D.O., conducted a consultative physical examination on November 4, 2008. (R. 218-230). Dr. Patterson wrote that Genson had initially been "disruptive" in the waiting room because he was mad that his appointment was almost an hour late, but that Genson became cooperative after being "confronted" about his behavior. (R. 218-19). Genson reported that as a child, he had sustained bilateral burns on his legs that required skin grafting. (R. 218). He had leg cramps and paresthesias when standing for more than 10 minutes. *Id.* Genson reported that he had been fired from his last job in December 2007 for having a "bipolar episode." *Id.* Dr. Patterson's physical examination was normal, other than Genson's complaint of left heel pain and right ankle weakness that prevented him from walking heel to toe. (R. 219-23). Dr. Patterson found that Genson had normal thought processes. (R. 219). At the

---

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00(C). *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

[5] An episode of decompensation is defined as "exacerbation or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Listing 12.00(C)(4). The episodes are of extended duration when they last at least two weeks. *Id.*

conclusion of his examination, Dr. Patterson made the following assessment of Genson:

> 1) parathesias in bilateral LE's with extended standing due to history of STSG from burns.
> 2) psychiatric disorders beyond the scope of this internist exam.

*Id.*

On November 7, 2008, non-examining agency consultant Joan Holloway, Ph.D., reviewed all the medical evidence in the file as of that date and affirmed Dr. Kampschaefer's August 11, 2008 assessment that Genson had a non-severe medically determinable mental impairment. (R. 224).

## Procedural History

Genson filed an application on May 14, 2008 seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 et seq. (R. 105-07). Genson alleged onset of disability as November 30, 2007. (R. 105). The application was denied initially and on reconsideration. (R. 64-67). A hearing before ALJ Richard J. Kallsnick was held December 3, 2009 in Tulsa, Oklahoma. (R. 22-56). By decision dated January 22, 2010, the ALJ found that Genson was not disabled. (R. 8-21). On February 17, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The

_____

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ made his decision at Step Two of the evaluation process. At Step One, the ALJ found that Genson had not engaged in any substantial gainful activity since his application date of May 14, 2008. (R. 13). At Step Two, the ALJ found that Genson had a medically determinable impairment of generalized anxiety disorder, but found that this impairment, or combination of impairments was not severe. *Id.* Therefore, the ALJ found that Genson was not disabled from May 14, 2008, through the date of his decision. (R. 18).

## Review

On appeal, Genson asserts that the ALJ erred in his finding that Genson did not have a severe impairment at Step Two, in failing to properly consider medical opinion evidence, and in his credibility determination. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and satisfies legal requirements, the ALJ's decision is affirmed.

## Step Two

The ALJ decided this case at Step Two of the five-step sequential process, finding that Genson did not have a severe impairment. To meet his burden under Step Two of the evaluative process, a claimant must show that impairments are "severe;" that is, that the impairments significantly limit his ability to do basic work activities. 20 C.F.R. § 404.1520. "Only those claimants with *slight* abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring) (emphasis added).

SSR 96-3p sets forth the process for a Step Two determination: (1) the claimant must have a medically determinable impairment; (2) this impairment must reasonably be expected to produce the alleged symptoms; and (3) once the claimant establishes the requisite connection between the medically determinable impairment(s) and alleged symptom(s), the Commissioner is to then consider the "intensity, persistence, or functionally limiting effects of the symptom(s)" to determine whether the limitation is severe; that is, whether it has more than a minimal effect on the claimant's ability to do basic work activities. SSR 96-3p, 1996 WL 374181.

While the Step Two burden has been characterized as "*de minimis*," the mere presence of a condition is not sufficient. *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003). Thus, in *Williamson*, the claimant did not carry his burden at Step Two, when he showed that he was abnormally underweight, but he did not allege any disabling symptoms related to that abnormal condition. *Id. See also Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (no error when ALJ found that radiculopathy was not severe before the insurance window closed when evidence of severity of radiculopathy appeared after the window).

In reliance upon Dr. Morgan's examination and report, the ALJ found at Step Two that Genson had a medically determinable impairment of generalized anxiety disorder, but that it was not severe. (R. 13-18). In reaching this conclusion, the ALJ addressed the four categories of the Paragraph B Criteria. (R. 17-18). Noting that Genson was able to care for his toddler, watched TV, was capable of doing housework, took care of his own personal needs, and drove without restrictions, the ALJ determined that Genson had only mild limitation in activities of daily living. (R. 17). With regards to social functioning, the ALJ found that Genson had mild limitations, as he had regular contact with family and others, shopped, and went to the movies. *Id.* Referencing Dr. Morgan's report, the ALJ found that Genson had mild limitations regarding concentration,

persistence or pace. (R. 18). Finally, the ALJ found no episodes of decompensation that had been of extended duration. *Id.*

Genson argued that he also had medically determinable impairments of major depressive disorder with psychotic features and of ADHD, which the ALJ should have considered severe at Step Two.[7] (Opening Brief, Dkt. # 12, p. 2). However, the existence of a medically determinable impairment can *only* be established by evidence from acceptable medical sources. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007); SSR 06-03P, 2006 WL 2329939, *2 (*citing* 20 C.F.R. §§ 404.1513(a) and 416.913(a)). The only diagnoses of ADHD and depression in Genson's medical records are provided by Mr. Teel, a licensed therapist whom Genson saw only on a couple of occasions. (R. 201, 215, 260). Pursuant to 20 C.F.R. § 404.1513(a), Mr. Teel is not an "acceptable medical source" and his diagnoses cannot establish the existence of a medically determinable impairment. *Crane v. Astrue*, 369 Fed. Appx. 915, 919 (10th Cir. 2010); *see also Lyles v. Barnhart*, 181 Fed. Appx. 720, 724 (10th Cir. 2006) (licensed counselor was not an acceptable medical source). Instead, a therapist is considered an "other source" whose opinion may be used to show the severity of a claimant's impairment and how it affects a claimant's ability to work. 20 C.F.R. § 404.1513(d); *Crane*, 369 Fed. Appx. at 919; *Frantz,* 509 F.3d at 1301.

Although Dr. Mallgren would be considered an acceptable medical source, the record does not reflect that he formed any diagnosis. Nor does Dr. Mallgren offer any opinions on Genson's functional limitations. *Cowan v. Astrue,* 552 F.3d 1182, 1189 (10th Cir. 2008)

---

[7] Genson argued that his alleged suicide attempt in 2004 was evidence of an episode of deterioration or decompensation that should meet the severity requirement of Step Two. (Opening Brief, Dkt. 12, p. 3). Not only did this alleged episode occur several years before the relevant time frame of May 14, 2008 through January 22, 2010, but on at least two other occasions, Genson denied a history of suicide attempts, suicidal behavior, and episodes of decompensation. (R. 171, 177-78).

("[T]rue medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform.").   Because there is no evidence from an acceptable medical source concerning Genson's depression and ADHD, those impairments are not medically determinable.  *Id.*  Dr. Mallgren's notes actually discount Genson's claim of psychosis or psychotic features, as Dr. Mallgren noted at every appointment that Genson specifically denied such symptoms.  (*E.g.* R. 197, 232, 242, 245, 248, 252, 257).  Therefore, the ALJ did not err in his consideration of these diagnoses at Step Two.

**Opinion Evidence**

In reaching his determination that Genson did not have a severe impairment, the ALJ gave great weight to Dr. Morgan's evaluation and little weight to the opinion of Mr. Teel.  (R. 16).  Genson argues that the ALJ failed to properly analyze and weigh the opinions of treating sources, including Mr. Teel, and their findings of GAF scores ranging from 43 to 50.  (Opening Brief, Dkt. # 12, pp. 4-6).  As discussed above and as set forth by the ALJ, Mr. Teel, is not an acceptable medical source and his opinion is "not entitled to the same significant weight" as a medical opinion from a treating physician. (R. 16).  *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000).  For the same reasons, Mr. Merrill, a counselor with F&CS, is also not an acceptable medical source.

It also appears from the record that Mr. Merrill saw Genson on only one occasion and Mr. Teel saw Genson on only two[8] occasions, one of them brief, as part of a screening or intake process for their respective agencies.  (R. 168-74, 210-17).  It is doubtful that either of these

---

[8] Mr. Teel may have seen Genson on one other occasion, 12 months after the initial screening; however, the record is unclear.  (*See supra*, n. 3).  Regardless, the Court's analysis remains the same.

counselors could properly be labeled as a treating source.  As the Tenth Circuit has set forth:

> The treating [source]'s opinion is given particular weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations. . ." 20 C.F.R. § 416.927(d)(2).  This requires a relationship of both duration and frequency. "The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994) (emphasis added). . .
>
> [An] opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. . . [T]he opinion of an examining [source] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 372, 374 (10th Cir.1995) (emphasis added).

*Doyal v. Barnhart*, 331 F.3d 758, 162-63 (10th Cir. 2003).  To be entitled to special weight as that of a "treating source," Mr. Teel and Mr. Merrill would have had to have "seen the claimant 'a number of times and long enough to have obtained  a longitudinal picture of [the claimant's] impairment,' taking into consideration 'the treatment the source has provided' and 'the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.'" *Id*. at 163 (*quoting* 20 C.F.R. 416.927(d)(2)(i)-(ii)).  The evaluations and opinions that Genson urges should have been given more weight were provided by two unacceptable medical sources, both at initial screenings with two different agencies, without any formal psychiatric testing, and with no subsequent treatment from either particular counselor. The opinions of Mr. Teel and Mr. Merrill are not the type of longitudinal  "treating source" opinions that are entitled to special weight.  *Doyal*, 331 F.3d at 163.  Accordingly, the undersigned finds no error in the way the ALJ discussed, considered, or weighed the evidence and opinions of Mr. Teel and Mr. Merrill.

In addition, the GAF scores the ALJ rejected do not establish that Genson had a severe impairment. *Holcomb v. Astrue*, 389 Fed. Appx. 757, 759 (10th Cir. 2010) (unpublished) (stating that a GAF score "taken alone does not establish an impairment serious enough to preclude an ability to work"). The subjective GAF scores assigned by the therapists were not helpful because they were not linked to any specific work-related limitations. *Butler v. Astrue*, 412 Fed. Appx. 144, 147 (10th Cir. 2011) (unpublished). As recognized in *Holcomb*, "because these GAF scores are the opinions of providers who are not acceptable medical sources, they cannot, by themselves, establish a medically determinable impairment, constitute a medical opinion, or be considered the opinions of a treating source." 389 Fed. Appx. at 759 (citations omitted); *see also Luttrell v. Astrue*, 453 Fed. Appx. 786, 791 (10th Cir. 2011) (unpublished) (GAF scores assessed by counselor do not qualify as a medical opinion). Moreover, the low GAF scores of 43, 46, and 50 assessed by the counselors (R. 173, 201, 260) are supposed to indicate "serious symptoms" or "serious impairment" in psychological, social, occupational, or school functioning. DSM IV at 34. These scores directly contradict the counselors' findings on Axis IV[9] of moderate, mild, or no problems with regard to social, occupational, or educational issues. (R. 173, 201, 260).

Genson also complains that the ALJ ignored the testimony of the VE related to Genson's GAF scores. This argument, too, was rejected by the Tenth Circuit in *Luttrell*. It was argued in *Luttrell* that the ALJ ignored the VE's testimony that the claimant could not work given her GAF scores. 453 Fed. Appx. at 791. The Tenth Circuit explained that the ALJ was not required to

---

[9] Axis IV reflects psychosocial and environmental problems, which are grouped together in categories: problems with primary support group, problems related to the social environment, educational problems, occupational problems, housing problems, economic problems, problems with access to health care, legal problems, and other psychosocial and environmental problems. DSM IV at 31-32.

adopt GAF scores assessed by therapists when they were inconsistent with the opinions of the consulting examiner, who was an acceptable medical source. *Id.* Here, the ALJ specifically discussed the GAF scores and gave reasons for giving them reduced weight. (R. 16). The ALJ therefore considered the GAF scores and, as was true in *Luttrell*, the circumstances of the present case were not such that the ALJ was required to adopt them. Therefore, the ALJ was entitled to ignore the testimony of the VE that was predicated on GAF scores that the ALJ did not adopt. *Luttrell*, 453 Fed. Appx. at 791-92. Moreover, the testimony of the VE is relevant only at Steps Four and Five, not at Step Two in determining severity of impairments.

Finally, the Court finds that the ALJ properly weighed and discussed the medical opinions in the record. The ALJ stated he gave "great weight" to the opinion of Dr. Morgan and "some weight" to the opinions of Drs. Kampschaefer and Holloway. (R. 16-17). The ALJ also discussed the medical evidence in the record and fully discussed Genson's credibility. The ALJ's determination was supported by substantial evidence, including the examination and opinion evidence of Dr. Morgan (R. 176-80) and the opinion evidence of nonexamining consultants Drs. Kampschaefer and Holloway. (R. 181-94, 224). *Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination).

**Credibility**

Once a medically determinable impairment is established that could reasonably be expected to produce the symptoms complained of, the ALJ is required to evaluate the intensity,

persistence, and functionally limiting effects of the symptoms. 20 C.F.R. §§ 404.1529(c), 404.929(c). In order to do this, the ALJ must assess the credibility of the claimant's statements regarding the symptoms and their functional effects. SSR 96-7p, 1996 WL 374186, at *1. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. Some of the factors the ALJ may consider in assessing the credibility of a claimant's complaints include "the levels of medication and their effectiveness, the extensiveness of the attempts ... to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Kepler*, 68 F.3d at 391 (quotation and citation omitted).

In his decision, the ALJ found that Genson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments for the reasons described below."[10] Although the ALJ could have been more

---

[10] Genson faulted this language as meaningless boilerplate, but this sentence was merely an introduction to the ALJ's analysis and was not harmful. *See Kruse v. Astrue*, 436 Fed. Appx. 879, 887 (10th Cir. 2011) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis") (quotation omitted). Notably, even Genson's argument on credibility appears to be copied and pasted from another

detailed in his credibility analysis, he did set forth sufficient and specific reasons for his finding that Genson lacked credibility. One reason the ALJ discussed was Genson's non-compliance with picking up and/or taking his prescribed medications even though he reported they helped, as well as missing scheduled appointments. (R. 17). It is entirely proper for the ALJ to consider Genson's compliance with his treatment regimen. *See Romero v. Astrue*, 242 Fed. Appx. 536, 543 (10th Cir. 2007) (unpublished) (among other factors, non-compliance with medication and missed appointments constituted substantial evidence for discounting credibility).

The ALJ also noted that no treating physician had found limitations greater than those determined by the ALJ and that no treating physician had placed functional restrictions on Genson that would interfere with his ability to work. (R. 17). The Tenth Circuit has affirmed decisions in which credibility was based in part on the fact that no treating physician had placed restrictions on the claimant. *See, e.g., Boswell v. Astrue*, 450 Fed. Appx. 776, 778 (10th Cir. 2011) (unpublished); *Holden v. Astrue*, 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished).

The ALJ also discussed Genson's daily activities and found that they "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant has reported that he helps to take care of his children, helps with the housework, watches television, plays video games, shops, visits with family, works on cars and goes to the movies occasionally with his girlfriend." (R. 17). It is entirely proper for an ALJ to consider a Claimant's activities of daily living ("ADLs") when evaluating credibility. *Hamlin*, 365 F.3d at 1220. Consideration of Genson's ADLs, which were more than minimal, as one aspect of his credibility finding was not in error where it was not the sole reason for his determination. *Kruse*,

brief prepared by Genson's counsel, as evidenced by the misquote of the ALJ's decision, reference to Genson as "her," and argument concerning the ALJ's RFC determination, which the ALJ did not make in the case at hand. (Opening Brief, Dkt. # 12, pp. 6-7).

436 Fed. Appx. at 886; *see also Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished).

The ALJ discussed Dr. Morgan's evaluation and his diagnosis of generalized anxiety disorder and a GAF score of 71-75. (R. 16). The ALJ's reliance upon the inconsistency between Dr. Morgan's evaluation and Genson's complaints is yet another specific reason for finding Genson less than credible. Thus, the ALJ gave specific, legitimate reasons for his finding that Genson was not fully credible, and his determination therefore complies with the legal requirements cited above.

Genson argues the fact that none of his medical providers opined that he could work full-time or the fact that none had reported that he exaggerated his symptoms were additional facts that supported a favorable credibility finding. (Opening Brief, Dkt. # 12, p. 7). A claimant made a similar argument in a Tenth Circuit case, listing "certain pieces of favorable evidence." *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished). The Tenth Circuit said that the only question it needed to consider was whether the ALJ's adverse credibility assessment "was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion." *Id.* at 686. The Tenth Circuit found no reason to overturn the ALJ's credibility determination. *Id. See also Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to require discussion). This Court also finds that the ALJ's credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Genson was not fully credible.

Genson's multiple arguments regarding the ALJ's credibility assessment constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to

substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *see also Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence). All of Genson's arguments are essentially that Genson would like for this Court to give more weight to the evidence that is in his favor and less weight to the evidence that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted). The undersigned finds no error in the ALJ's credibility assessment.

## Conclusion

Based upon the foregoing, the Court **AFFIRMS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 14th day of August, 2012.

Paul J. Cleary
United States Magistrate Judge